UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SHARON GORDON,

      Plaintiff,

v.                            Case No. 2:19-cv-890-NPM

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____

## OPINION AND ORDER

Sharon Gordon seeks judicial review of a denial of Social Security disability insurance benefits. The Commissioner of the Social Security Administration filed the transcript[1] of the proceedings, and the parties filed a Joint Memorandum (Doc. 18). As discussed in this opinion and order, the decision of the Commissioner is affirmed.

## I.    Eligibility for Disability Benefits and the ALJ's Decision

### A.    Eligibility

The Social Security Act and related regulations define disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death

---

[1] Cited as "Tr." followed by the appropriate page number.

or that has lasted or can be expected to last for a continuous period of not less than twelve months.[2] The impairment must be severe, making the claimant unable to do her previous work or any other substantial gainful activity that exists in the national economy.[3]

## B.    Factual and procedural history

Gordon was born in March 1951. (Tr. 107, 120, 219). She has a high school education, attended two years of college, and last worked as a deputy executive director. (Tr. 24, 253). On June 24, 2016, Gordon applied for disability insurance benefits. (Tr. 15, 107, 121, 219-225). Gordon asserted a disability onset date of January 15, 2016, due to the following: trigeminal neuropathy; torn meniscus right knee; two craniotomies; and "cholesterol." (Tr. 15, 107-107, 120-121).

Gordon's application was administratively denied initially on November 4, 2016, and upon reconsideration on April 7, 2017. (Tr. 15, 107-118, 120-129). At Gordon's request, the Administrative Law Judge ("ALJ") held a hearing on May 21, 2018. (Tr. 32-77, 146-147). The ALJ issued an unfavorable decision on October 31, 2018, finding Gordon not disabled from January 15, 2016, through December 31, 2016. (Tr. 12-26).

---

[2] *See* 42 U.S.C. §§ 416(i), 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905.

[3] *See* 42 U.S.C. §§ 423(d)(2), 1382c(a)(3); 20 C.F.R. §§ 404.1505-404.1511, 416.905-416.911.

On October 17, 2019, the agency's Appeals Council denied Gordon's request for review. (Tr. 1-6). Gordon then filed a Complaint on December 16, 2019 (Doc. 1), and the case is ripe for review. The parties consented to proceed before a United States Magistrate Judge for all proceedings. (*See* Doc. 17).

## C.    The ALJ's decision

An ALJ must perform a "five-step sequential evaluation" to determine if a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(1). This five-step process determines:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform [her] past relevant work; and (5) if not, whether, in light of [her] age, education, and work experience, the claimant can perform other work that exists in significant numbers in the national economy.

*Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 933 (11th Cir. 2015) (internal quotation omitted); *see also* 20 C.F.R. §§ 404.1520(a)(4).

The governing regulations provide that the Social Security Administration conducts this "administrative review process in an informal, non-adversarial manner." 20 C.F.R. §§ 404.900(b). Unlike judicial proceedings, SSA hearings "are inquisitorial rather than adversarial." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1364 (11th Cir. 2018) (quoting *Sims v. Apfel*, 530 U.S. 103, 111 (2000) (plurality opinion)). "Because Social Security hearings basically are inquisitorial in

nature, '[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.'" *Id*. Indeed, "at the hearing stage, the Commissioner does not have a representative that appears 'before the ALJ to oppose the claim for benefits.'" *Id*. (quoting *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000)). "Thus, 'the ALJ has a basic duty to develop a full and fair record. This is an onerous task, as the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'" *Id*. (quoting *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015)).

Nonetheless, while the claimant is temporarily relieved of the burden of production during step five as to whether there are enough jobs the claimant can perform, the claimant otherwise has the burdens of production and persuasion throughout the process. *See Washington*, 906 F.3d at 1359; 20 C.F.R. §§ 404.1512, 416.912 (providing that the claimant must prove disability); *see also Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983) ("The scheme of the Act places a very heavy initial burden on the claimant to establish existence of a disability by proving that he is unable to perform his previous work."); *Doughty v. Apfel*, 245 F.3d 1274, 1280 (11th Cir. 2001) ("[T]he overall burden of demonstrating the existence of a disability as defined by the Social Security Act unquestionably rests with the claimant.").

In this matter, the ALJ found Gordon last met the insured status requirements on December 31, 2016. (Tr. 17). At step one of the evaluation, the ALJ found Gordon had not engaged in substantial gainful activity from January 15, 2016, the alleged onset date, through December 31, 2016, the date last insured. (Tr. 17). At step two, the ALJ characterized Gordon's severe impairments as: status post right knee meniscus surgery; status post partial mastectomy in 2016; and trigeminal neuropathy. (Tr. 17). At step three, the ALJ determined Gordon did not have an impairment or combination of impairments that met or medically equaled the severity of an agency-listed impairment. (Tr. 18).

As a predicate to step four, the ALJ arrived at the following RFC:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant has the residual functional capacity to perform sedentary work as defined in 20 [C.F.R. §] 404.1567(a). The claimant can lift and or carry a maximum of 10 pounds. The claimant can stand or walk for 6 hours in an 8-hour day. The claimant can sit for 6 hours in an 8-hour day. However, the claimant can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs. The claimant can frequently balance, stoop, but can only occasionally kneel and crouch. The claimant can never crawl. The claimant should avoid moderate exposure to vibrations and workplace hazards such as unprotected heights and unshielded rotating machinery. The claimant must avoid concentrated exposure to environmental extremes of cold. The claimant can only use her hands occasionally.

(Tr. 19). At step four, relying on the testimony of the vocational expert, the ALJ found Gordon is unable to perform any past relevant work. (Tr. 23-24). But, the ALJ found Gordon acquired skills from her past relevant work. (Tr. 24).

Finally, at step five, the ALJ found Gordon's acquired skills were transferrable to other occupations with jobs existing in significant numbers in the national economy. (Tr. 24). In support, the vocational expert identified three representative occupations an individual with Gordon's age (65 years old as of the date last insured), education (at least a high school education), work experience as an Assistant Deputy Director, and RFC could perform:

(1) human resources assistant, DOT 209.362-026, SVP 4;

(2) travel clerk, DOT 238.367.030, SVP 4; and

(3) information clerk, DOT 237.367.022, SVP 4.

(Tr. 24-25).[4] The ALJ, therefore, concluded that Gordon had not been under a disability within the meaning of the Social Security Act from January 15, 2016 through December 31, 2016. (Tr. 25-26).

## II.   Analysis

Gordon's appeal presents the following issues:

(1)   Whether the ALJ properly considered the opinions of Dr. Marlind Alan Stiles and Dr. Christopher Farrell;

(2)   Whether the ALJ erred in evaluating the intensity, persistence, and

---

[4] The DOT numbers refer to the Dictionary of Occupational Titles and its detailed explanations concerning each occupation's requirements. These descriptions include exertion and skill levels. Exertion refers to the work, in a purely physical sense, that the job requires, and it is divided into five categories: sedentary, light, medium, heavy and very heavy. Skill refers to how long it takes to learn the job, and it is divided into three categories: unskilled, semiskilled and skilled, with the "SVP" (Specific Vocational Preparation) providing further subdivision of the three skill categories into nine levels: SVP 1 and 2 are unskilled, SVP 3 and 4 are semiskilled, and SVP 5 through 9 are skilled.

limiting effects of Gordon's symptoms; and

(3)    Whether the ALJ properly relied on the vocational expert testimony
at step 5.

(Doc. 18, pp. 10-32).

## A.    Standard of review

While the Court must account for evidence both favorable and unfavorable to a disability finding and view the evidence as a whole, *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), the Court's review of the agency's decision is limited to determining whether "it is supported by substantial evidence and based on proper legal standards." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1280 (11th Cir. 2020) (quoting *Crawford*, 363 F.3d at 1158).

"[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The inquiry is "case-by-case," and "defers to the presiding ALJ, who has seen the hearing up close." *Id*. at 1157. If supported by substantial evidence, the ALJ's findings of fact are conclusive. 42 U.S.C. § 405(g). This means the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the court finds that the evidence "preponderates against" the agency's decision. *Noble v. Comm'r of Soc. Sec.*, 963

F.3d 1317, 1323 (11th Cir. 2020) (quoting *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991)).

**B.    Whether the ALJ properly considered the opinions of Dr. Stiles and Dr. Farrell.**

Gordon challenges the ALJ's reasons for affording less than controlling weight to the opinions of Dr. Stiles and Dr. Farrell. Weighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of the ALJ's residual-functional-capacity determination. *See Rosario v. Comm'r of Soc. Sec.*, 877 F. Supp. 2d 1254, 1265 (M.D. Fla. 2012). Whenever a physician offers an opinion concerning the nature and severity of a claimant's impairments— including the claimant's symptoms, diagnosis, and prognosis; physical and mental restrictions; or what the claimant can still do—the ALJ must state with particularity the weight given to the opinion and the reasons therefor. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011).[5] Without such an explanation, "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Id.* at

---

[5] For claims filed on or after March 27, 2017, the term "medical opinion" is no longer defined to include a diagnosis, prognosis, or judgment about the nature and severity of an impairment. Rather, it refers only to statements about what the claimant can still do despite any impairment(s), and whether there are any limitations in the claimant's abilities to perform the various demands of work and adapt to work-related conditions. *See* 20 C.F.R. § 404.1513(a)(2).

1179 (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir.1981)).

With respect to applications filed before March 27, 2017, an ALJ must consider several factors when assigning weight to medical opinions. 20 C.F.R. § 404.1527(c). "For instance, the Social Security regulations command that the ALJ consider: (1) the examining relationship; (2) the treatment relationship, including the length and nature of the treatment relationship; (3) whether the medical opinion is amply supported by relevant evidence; (4) whether an opinion is consistent with the record as a whole; and (5) the doctor's specialization." *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1260 (11th Cir. 2019) (citing *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987)).

Absent "good cause," the opinion of a treating physician must be given "substantial or considerable weight" *Williams v. Comm'r, Soc. Sec. Admin.*, 805 F. App'x 692, 694 (11th Cir. 2020) (citing *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011)); *see* 20 C.F.R. § 404.1527(c)(2) (noting that an ALJ must provide "good reasons" for the weight given to a treating source's opinion).[6] "Good cause" exists where "(1) the opinion was not bolstered by the evidence; (2)

---

[6] The Social Security Administration has changed the treating physician rule for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," available at https://www.regulations.gov/document?D=SSA-2012-0035-0001. The SSA will no longer give any specific evidentiary weight to medical opinions, including affording controlling weight to medical opinions. Rather, the SSA will consider the persuasiveness of medical opinions using the factors specified in their rules and will consider the supportability and consistency factors as the most important factors. *See* 20 C.F.R. § 404.1520c. Since Gordon filed her claim before March 27, 2017, the former treating physician rule applies. 20 C.F.R. § 404.1527(c).

the evidence supported a contrary finding; or (3) the opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* (cleaned up).

### 1.    *Dr. Marlind Alan Stiles, DMD*

Dr. Stiles is Gordon's treating physician who specializes in facial pain management. (Doc. 18, p. 5; Tr. 814). The record contains treatment notes from December 4, 2015 (Tr. 407-409), June 9, 2016 (Tr. 404-406), August 16, 2016 (Tr. 401-403), December 20, 2016 (Tr. 818-825), May 5, 2017 (Tr. 826-835), September 11, 2017 (Tr. 836-843), and April 24, 2018 (Tr. 849-853). There is also an opinion letter dated June 24, 2015 (Tr. 814, 847), which pre-dates all his treatment notes in the record.

In his June 2015 letter, before Gordon's alleged onset date, Stiles opined about Gordon's trigeminal neuralgia and associated limitations. (Tr. 814, 847). He explained that Gordon was first referred to him by Dr. Farrell for medical management of her trigeminal neuralgia and her trigeminal neuropathic pain, which arose from her multiple root canals and dental procedures. (Tr. 814, 847). He reported that medication management was initially successful in controlling her neuralgia but not her neuropathic pain; but as Farrell had also reported, Gordon had multiple medication failures due to allergies and reactions, so Farrell performed a microvascular decompression surgery. (Tr. 814, 847). Stiles noted the surgery helped to resolve the classical trigeminal neuralgia attacks of pain but did not help

10

her left V2 trigeminal neuropathic pain which is a continuous fluctuating pain that at times becomes very severe. (Tr. 814, 847). He observed that Gordon's pain can be exacerbated by cold wind and by stimulating the left V2 with chewing and talking. (Tr. 814, 847). Stiles worked with Gordon every 8-15 weeks trying several different medications, but her regimen offered only moderate relief of her symptoms. (Tr. 814, 847). He noted that trigeminal neuropathic pain will sometimes resolve in the first 18-24 months after initial injury, but Gordon's ongoing condition was well outside that time frame. (Tr. 814, 847). He concluded with his opinion that her trigeminal neuropathic pain is "continuous and permanent and will require on-going medical management indefinitely." (Tr. 814, 847).

The ALJ afforded partial weight to Stiles's opinion, reasoning as follows:

> Dr. Stiles stated that the claimant's pain levels affect her daily activities and limit her ability to fulfill her requirements at work. Additionally, that increasing the dosage of her medications improves the pain, but leads to side effects that affects her cognition and balance to the point that she cannot work effectively and feels unsafe driving (Exhibit 18F). Dr. Stiles' treatment notes do not substantiate that the claimant would be disabled according to Social Security standards. In particular, I note that Dr. Stiles stated in his treatment note for December 20, 2016 that during his physical examination of the claimant, he reported, "She is alert and oriented to person, place, and time. No cranial nerve deficit" (Exhibit 17F/7). Then, on the next page of his treatment note Dr. Stiles reported that she has Atypical face pain and prescribed gabapentin four times per day. Under his assessment for Trigeminal neuralgia, he stated, "She has had to escalate her gabapentin dosage as the weather has gotten colder. So, as she heads to Florida, I expect her not to require as much." This indicates that he[r] face pain is related to cold weather. Now that she lives in Florida, it can be expected that her pain will not be as severe as it was in New Jersey. However, Dr. Stiles' medical source statement is dated June 24, 2015, before the appointments discussed above. Furthermore, a doctor's statement indicating that a claimant is

11

"disabled," or "unable to work," is not a medical opinion, but rather an administrative finding of a case. Whether a claimant is "disabled" is an issue reserved to the Commissioner, and any opinions regarding the ultimate issue of disability are not entitled to any special significant weight.

(Tr. 23).

First, Gordon claims that Stiles's December 20, 2016 note that she appeared "alert and oriented to person, place, and time [and had no] cranial nerve deficit," does not equate to functional improvement in her pain symptoms. (Doc. 18, pp. 14-15; *see* Tr. 823). In earlier visits during the relevant time period, Stiles consistently noted "no abnormalities detected" in his neurologic reviews (Tr. 402, 405-406) and even shortly before the alleged onset of disability (Tr. 408-409). Although after her date last insured, Stiles made this exact same notation about being alert and oriented and having no cranial nerve deficits in subsequent treatment notes from May 5, 2017 (Tr. 833), September 11, 2017 (Tr. 841), and April 24, 2018 (Tr. 851). Gordon may be correct in stating that these seemingly normal neurological findings do not show a progression of improvement since all the available treatment records consistently indicate the same thing. In fact, Stiles previously indicated in his letter that Gordon's condition is a permanent and "continuous fluctuating pain that at times becomes very severe," which implies that her flares ups may not necessarily occur during regular office visits. While this reason alone may be weak, any error is harmless because the ALJ still provided other good reasons to discount Stiles's opinion.

12

Next, Gordon avers the ALJ impermissibly substituted his own lay opinion for that of Gordon's treating physician when he speculated that her pain will not be as severe now that she lives in Florida. (Doc. 18, pp. 15-16). However, the ALJ merely adhered to Stiles's December 20, 2016 supposition in this regard. (Tr. 824). Stiles noted that Gordon required a higher dosage of her pain medication "as the weather has gotten colder. So as she heads to Florida I expect her not to require as much [pain medication]." (Tr. 824). And Gordon admitted during the hearing before the ALJ that her condition is exacerbated by a cold climate, albeit not the sole factor affecting it. (Doc. 18, p. 15; *see* Tr. 52-55; Tr. 69 (Gordon testified "moving down [to Florida] has helped [her] pull back on the [Gabapentin], but [she] still take[s] a significant amount of it."). Although the ALJ relied on a December 20, 2016 treatment note in particular, Gordon cited to an earlier treatment note from June 9, 2016[7] for support, wherein Stiles wrote that Gordon had been in Florida for several months and tried to wean off her medication but found the pain was still there. (Tr. 404). However, on this same page, Stiles noted that Gordon actually did decrease her pain medication dosage. (Tr. 404 (noting she decreased her total Gabapentin dosage from 900 mg to 800 mg daily)). Stiles's subsequent records indicate that Gordon then had to increase her pain medication during the winter months due to

---

[7] Gordon claims the treatment note was from March 2016, but there is no treatment note from that date and her citation corresponds to a June 9, 2016 encounter. (Doc. 18, p. 15; Tr. 404).

the cold temperatures. (Tr. 824). The ALJ committed no error by partially relying on Stiles's opinion when he determined that her face pain was affected by cold weather.

Moreover, Gordon contends the ALJ did not consider the treatment relationship and specialization factors from 20 C.F.R. § 404.1527(c). (Doc. 18, p. 16). While an ALJ must consider these factors and articulate good reasons for giving less than controlling weight to the opinion of a treating physician, there is no rigid requirement that he explicitly discuss each and every factor provided he gives sufficient good reasons. *Davis-Augustin v. Colvin*, No. 3:14-cv-113/EMT, 2015 WL 5042752, *11 (N.D. Fla. Aug. 26, 2015) (finding an "ALJ need not separately discuss every factor that she considers in according weight to the treating source's opinion, provided she gives good reasons.") (citations omitted); *see Edgecomb v. Comm'r of Soc. Sec.*, No. 20-11752, 2020 WL 7774948, *2 (11th Cir. Dec. 30, 2020) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision was not a broad rejection that did not enable the court to conclude that the ALJ considered the claimant's medical condition as a whole.") (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)); *see also* 20 C.F.R. § 404.1527(c) ("Unless we give a treating source's medical opinion controlling weight … we *consider* all of the following factors in deciding the weight we give to any medical opinion.") (emphasis added).

Here, the ALJ afforded only partial weight to Stiles's opinion after sufficiently discussing the supportability and other factors. For instance, he found that Stiles's treatment notes did not substantiate that Gordon is disabled under Social Security standards, and his medical source statement opining Gordon is "disabled" and "unable to work" are not medical opinions. (Tr. 23). The ALJ correctly noted that an administrative finding of disability is an issue reserved to the Commissioner, and any opinions regarding the ultimate issue of disability are not entitled to any special significant weight. (Tr. 23); *see* 20 CFR § 404.1527(d). In addition, the ALJ noted that Stiles's June 2015 medical source statement predated all of this treatment notes in the record, as his earliest recorded treatment notes date back only to December 4, 2015. Thus, the ALJ provided sufficient reasons for affording partial weight to this opinion.

### 2.     *Dr. Christopher Farrell, M.D.*

Dr. Farrell appears to be a treating physician because he treated Gordon for facial pain since December 28, 2011. (Tr. 37, 815, 845). However, the record only contains two sets of treatment notes from February 21, 2012 (Tr. 806-809) and April 7, 2012 (Tr. 810-812) concerning her 2012 craniotomy and a follow up visit. Gordon testified that she saw Farrell after her second craniotomy in 2012 for a follow-up, but that Farrell eventually stopped seeing her after he referred her to Dr. Stiles for

treatment. (Tr. 48-49). The record also contains a letter from Farrell dated April 28, 2015, about three years after he last treated her (Tr. 48-49, 815, 845).[8]

In his April 2015 letter, before Gordon's alleged onset date, Farrell explained Gordon's medical history of trigeminal neuralgia and associated limitations. (Tr. 815, 845). Farrell explained that Gordon complained of short, electrical-type pain involving the left face in the distribution of the maxillary division (V2) of the trigeminal nerve that was intermittently present over a 4-year period. (Tr. 815, 845). The characteristics of her pain were consistent with classical trigeminal neuralgia, including triggers such as brushing her teeth, talking, and the wind touching her face. (Tr. 815, 845). She sought dental evaluation with performance of four root canals, but this caused worsening of her pain along with new onset of constant dysesthesias in the region of the dental interventions. (Tr. 815, 845). She was treated in the emergency room for her pain and diagnosed with trigeminal neuralgia. (Tr. 815, 845). Farrell initially treated her with carbamazepine with immediate resolution;

---

[8] The ALJ claimed that Dr. Farrell wrote a letter on February 1, 2012 and on April 28, 2015. (Tr. 23). However, there does not appear to be a letter from February 1, 2012 in the record. Rather, exhibit 16F is entitled office treatment records dated February 1, 2012, but this appears to be a mistake as this exhibit contains a copy of the April 28, 2015 letter.

however, she suffered an allergic reaction to this medication as well as other medications. (Tr. 42-43, 815, 845).

On February 21, 2012, Farrell performed surgery on Gordon, specifically a microvascular decompression of the trigeminal nerve, which resulted in complete resolution of the classical trigeminal neuralgia symptoms but persistence of the constant throbbing dysesthesias at the site of her previous dental surgeries. (Tr. 806-809, 815, 845). He found this highly consistent with a diagnosis of trigeminal neuralgia with superimposed trigeminal neuropathy secondary to injury to the trigeminal nerve branches during prior dental interventions. (Tr. 815, 845). He stated that she continued to have severe pain in the left face due to her trigeminal neuropathy despite escalating doses of multiple medications including gabapentin and clonazepam. (Tr. 816, 846). Farrell explained the medications "provide moderate pain relief but result in clinically significant cognitive impairment at the doses necessary to achieve the pain relief." (Tr. 816, 846).

In his 2015 letter, Farrell opined that the "persistent pain has affected her daily activities including her employment and she is unable to perform necessary responsibilities on days when the pain is most severe and require increased medication doses for relief." (Tr. 816, 846). Gordon also reported that her persistent pain and need for medications with associated cognitive side effects resulted in psychological distress and reduced quality of life. (Tr. 816, 846). He noted that

17

trigeminal neuropathic pain is typically permanent and that she will require life-long medication for pain relief. (Tr. 816, 846). He expected that she may need further surgical intervention which would likely result in permanent anesthesia of the left trigeminal nerve. (Tr. 816, 846).

The ALJ afforded little weight to Farrell's medical source letter because it did not account "for the improvements in [Gordon's] trigeminal neuralgia condition, changes in her medications, or physical improvements after the claimant moved from New Jersey to Florida." (Tr. 23). The ALJ also noted that a doctor's opinion that a claimant is "disabled," or "unable to work," is not a medical opinion, but rather an administrative finding of a case. The ALJ correctly observed that an administrative finding of disability is an issue reserved to the Commissioner, and any opinions regarding the ultimate issue of disability are not entitled to any special significant weight. (Tr. 23); *see* 20 CFR § 404.1527(d).

Gordon's objections to the ALJ's treatment of Farrell's opinion lack specific arguments and appear to coexist with her arguments concerning Dr. Stiles. (*See* Doc. 18, pp. 14-16). Giving Gordon the benefit of the doubt, it appears she argues there is no evidence in the record to suggest she had functional improvement in her pain symptoms. (Doc. 18, pp. 14-16). However, as previously noted, there are no treatment notes from Stiles before December 2015. (Tr. 407-409; *see* Tr. 49 (noting Exhibit 2F, containing the December 2015 treatment records, are the oldest records

18

of Dr. Stiles in evidence)). Therefore, the objective basis for Farrell's statement that "Gordon continues to suffer from severe pain in the left face due to her trigeminal neuropathy despite escalating doses of multiple medications including gabapentin and clonazepam by Dr. Stiles" has no support in the record. (Tr. 49-50, 816, 846). In fact, all of Stiles's treatment records in evidence, including his letter, are dated *after* Farrell's April 28, 2015 letter. (*See* Tr. 401-409, 814, 818-843, 847, 849-853). Therefore, the ALJ correctly observed that the subsequent improvements in Gordon's trigeminal neuralgia, changes in her medication, and physical improvements after her move to Florida were not accounted for in Farrell's 2015 letter. (Tr. 23; *see* discussion *supra* Section II.B.1).

Gordon also argues the ALJ did not consider the treatment relationship and specialization factors from 20 C.F.R. § 404.1527(c). (Doc. 18, p. 16). But, as already discussed, the ALJ did not need to run through each and every factor. (*See* discussion *supra* Section II.B.1). Here, the ALJ afforded only little weight to Farrell's opinion after sufficiently discussing the supportability and other factors. (Tr. 23).

### C.   Whether the ALJ erred in evaluating the intensity, persistence, and limiting effects of Gordon's symptoms

Residual functional capacity is the most a claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a). It consists of a claimant's "impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what [a claimant] can do in a work setting." 20 C.F.R. § 404.1545(a). An

ALJ will "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence" in the case. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(3).

An ALJ's determination whether a claimant's impairments limit her ability to work must include consideration of the claimant's subjective symptoms, including the effectiveness and side effects of any medications taken for those symptoms. 20 C.F.R. § 404.1529(c)(3)(iv). "However, statements about [a claimant's] pain or other symptoms will not alone establish that [a claimant is] disabled. There must be objective medical evidence from an acceptable medical source…" 20 C.F.R. § 404.1529(a). Side effects of medication can be a factor because they "could render a claimant disabled or at least contribute to a disability." *McDevitt v. Comm'r of Soc. Sec.*, 241 F. App'x 615, 619 (11th Cir. 2007) (quoting *Cowart v. Schweiker*, 662 F.2d 731, 737 (11th Cir. 1981)). However, the claimant must introduce evidence supporting her claim that her symptoms, including any medication side effects, make her unable to work. *Walker v. Comm'r of Soc. Sec.*, 404 Fed. Appx. 362, 366 (11th Cir. 2010) (citing *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003)). And a reviewing court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhard*, 395 F.3d 1206, 1210 (11th Cir. 2005).

When formulating the RFC, an ALJ employs a two-step process to consider a claimant's symptoms. First, the ALJ must determine whether the claimant's underlying medically determinable physical impairments could reasonably be expected to produce her pain or other symptoms. (Tr. 19). Second, the ALJ must evaluate the claimant's complaints about the intensity, persistence, and limiting effects of her symptoms to determine the extent to which they limited her functionality. (Tr. 19).

During the first step, the ALJ considered Gordon's claims that she is disabled and unable to work due to a combination of impairments, including trigeminal neuropathy, torn meniscus of the right knee, and craniotomies. (Tr. 19-20). The ALJ concluded Gordon's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. at 20). At the second step, the ALJ detailed Gordon's medical history and found that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 20). It is at this second step where Gordon takes issue.

Gordon argues the RFC does not reflect her mental impairments related to her trigeminal neuropathy pains and medication side effects. (Doc. 18, p. 12). However, Gordon does not explicitly explain what mental limitation is actually missing from the RFC. (Doc. 18, pp. 12-13). It appears she argues her RFC should have included

21

limitations for being off task because she has trouble maintaining focus and concentration. (Doc. 18, p. 12). Mainly she uses this argument to show that she was prejudiced at step five. (Doc. 18, pp. 12-13).

In this case, the ALJ applied the correct legal standard and adequately developed the record regarding the side effects of Gordon's medication for her trigeminal neuropathy. The ALJ considered Gordon's subjective complaints about the side effects and reports of drowsiness. (Tr. 20 ("Because of the medication, it is difficult for the claimant to wake up before 10:00 a.m.")). Concerning her ability to concentrate and focus, the ALJ found it was not consistent with the objective medical evidence. Specifically, he afforded only partial weight to Stiles's opinion because while he opined that increasing medication led to side effects that affected her cognition and balance, his treatment notes were inconsistent as they also indicated that she was "alert and oriented to person, place, and time." (Tr. 23).

Moreover, Gordon contends the ALJ should have limited her RFC further to account for her neuralgia pain being triggered by air conditioning. (Doc. 18, pp. 15-16). While the ALJ determined Gordon "must avoid concentrated exposure to environmental extremes of cold" (Tr. 19), Gordon argues the ALJ's limitation does not cover any limits on exposure to air conditioning (Doc. 18, p. 16). For support, Gordon cites to her testimony and treatment records from Stiles that transcribed her subjective complaints about air conditioning in Florida. (Doc. 18, p. 15 (citing Tr.

52, 407, 831-832)). Again, the ALJ afforded only partial weight to Stiles's opinion, which, as a whole, was not entirely consistent with Gordon's subjective complaints of pain. (Tr. 23; *see also* Tr. 404, 407, 861-832). The ALJ also found Gordon's statements not entirely consistent with other objective evidence. (Tr. 20). For example, while Gordon complained that air conditioning exacerbates her trigeminal neuralgia, she likewise claimed moving to Florida helped her condition. (Tr. 52).

Gordon similarly claims that while the ALJ limited her to avoiding "concentrated exposure to environmental extremes of cold," the ALJ failed to account for exposure to air conditioning because each job the vocational expert testified Gordon could perform are office jobs, and she would inevitably be exposed to air conditioning by virtue of living in Florida. (Doc. 18, pp. 15-16). Specifically, the vocational expert testified three jobs Gordon could perform include Human Resource Assistant, Travel Clerk, and Information Clerk. (Tr. 24-25, 75). The Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO") includes an appendix explaining the environmental conditions that are listed as categories for each occupation in the DOT. *Appendix D. Environmental Conditions*, SCODICOT Appendix D. The SCO defines "Extreme Cold," as "[e]xposure to *nonweather*-related cold temperatures." *Id.* (emphasis added). There is a separate condition for "Exposure to Weather," defined as "[e]xposure to outside atmospheric conditions." *Id.*

23

Noticeably, there are no other or lesser environmental conditions for nonweather-related coldness that are less intense than "extreme." Each occupation in the DOT includes information about "extreme cold," but no information about any lesser degree of "[e]xposure to nonweather-related cold temperatures" because there are none. And in each of the three occupations identified by the vocational expert, the DOT noted for both categories of "Exposure to Weather" and "Extreme Cold," the following: "Not Present - Activity or condition does not exist." *See* 209.362-026 PERSONNEL CLERK, DICOT 209.362-026; 238.367-030 TRAVEL CLERK, DICOT 238.367-030; 237.367-022 INFORMATION CLERK, DICOT 237.367-022. Gordon has not shown how air conditioning falls outside of the relevant agency definitions or how the ALJ failed to account for it when he limited her to avoiding "concentrated exposure to environmental extremes of cold." (Tr. 19).

Next, Gordon contends the ALJ's discussion was inadequate when he evaluated the intensity, persistence, and limiting effects of her symptoms. (Doc. 18, pp. 17-21). Specifically, she contends the ALJ failed to acknowledge that her complaints concerning the duration, frequency, and intensity of her flare ups of neuralgia pain made to various providers supported crediting her described limitations. (Doc. 18, p. 18 (citing Tr. 407, 594, 736-737, 734, 751, 758, 849)). Nonetheless, the ALJ cited several instances where her neurological findings were normal or stable. (Tr. 21-22). An ALJ may reject complaints of pain by offering

24

specific reasons. *See Foote v. Chater*, 67 F.3d 1553, 1561-1562 (11th Cir. 1995); *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992) ("After considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence.") (citing *Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir. 1984)). Here, the ALJ afforded some credibility to Gordon's complaints about trigeminal neuralgia because he limited Gordon to sedentary work with additional limitations to specifically account for it, such as avoiding concentrated exposure to environmental extremes of cold and moderate exposure to vibrations and workplace hazards. (Tr. 19, 22).

Gordon further contends that the ALJ made a misleading statement when he noted, "[d]uring the relevant time period, Dr. Stiles did not note any problems with the claimant's balance or cognition due to the claimant's impairment or side effects from her medication." (Doc. 18, p. 19; Tr. 22). For support, Gordon references a December 4, 2015 treatment note where she described "drinking a lot of coffee to try and counter the side effects." (Tr. 407). However, the ALJ's statement was not misleading as he qualified it by explicitly referencing the treatment records *during the relevant time period*, which began in January 2016. (Tr. 22).

Finally, Gordon contends the ALJ erred by failing to discuss her exemplary work history as a credibility enhancing factor. (Doc. 18, pp. 19-21 (citing *Lafond v. Comm'r of Soc. Sec.*, No. 6:14-cv-1001-Orl-DAB, 2015 U.S. Dist. LEXIS 86611,

*25-26 (M.D. Fla. July 2, 2015)). This argument provides no basis for reversal. *See Binder v. Comm'r of Soc. Sec.*, No. 3:17-cv-1024, 2019 WL 1397923, *10 (M.D. Fla. Mar. 28, 2019). Although the regulations require an ALJ to consider all of the evidence, including prior work history, in formulating the RFC, nothing requires an ALJ to explicitly discuss that work history as part of a subjective symptom evaluation. *See* 20 C.F.R. § 404.1529; SSR 96-8p, 1996 WL 374184; SSR 96-7p, 1996 WL 374186; *Mahon v. Comm'r of Soc. Sec.*, No. 8:16-cv-1462-T-JSS, 2017 WL 3381714, *10 (M.D. Fla. Aug. 7, 2017) ("Although the ALJ did not expressly discuss Plaintiff's work history in assessing her statements regarding her symptoms, it is clear the ALJ reviewed and considered statements regarding her prior work record.").

Besides, the ALJ and Gordon frequently referred to her work history during the hearing (Tr. 37-41, 53-56, 68-69). The ALJ also referenced Gordon's transferable skills when questioning the vocational expert (Tr. 70), and he noted in his decision that she performed her past relevant work long enough to achieve average performance (Tr. 23). *See Binder*, 2019 WL 1397923, at *10 (rejecting argument that ALJ must discuss claimant's "stellar" work history in subjective symptom evaluation because ALJ asked about work history during hearing and "could have but did not have to weigh [claimant's] work history favorably"). In addition, "there is no rigid requirement that the ALJ specifically refer to every piece

of evidence in his decision…" *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005). Therefore, the ALJ gave sufficient reasons for reaching his conclusion that Gordon's subjective symptoms were not entirely consistent with the medical evidence.

### D. Whether the ALJ properly relied on the vocational expert testimony at step 5

Gordon's first substantive argument was that due to the ALJ's errors in composing an RFC, he likewise erred at step five by not including additional limitations in the hypothetical questions to the vocational expert. (Doc. 18, pp. 12-13). Thus, Gordon claims there was no harmless error at step five. (Doc. 18, pp. 12-13). However, as previously discussed, the RFC was supported by substantial evidence, and therefore, Gordon's step five argument is without merit.

## III.   Conclusion

Upon consideration of the submission of the parties and the administrative record, the Court finds substantial evidence supports the ALJ's decision and there was either no error or no harmful error in the ALJ's application of the correct legal standard.

Accordingly, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court is directed to enter judgment, terminate any pending motions and deadlines, and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on March 31, 2021.

_____

NICHOLAS P. MIZELL
UNITED STATES MAGISTRATE JUDGE